# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                                                No. CR 01-1131 JP

VICTOR AVILA,

    Defendant.

## **MEMORANDUM OPINION AND ORDER**

        On November 27, 2001, the Court held a hearing on the Defendant's Motion to Suppress (Doc. No. 18). Defendant was present in person and was represented by Attorney Joe M. Romero, Jr.; Plaintiff was represented by Assistant United States Attorney James R. W. Braun. The Plaintiff presented the testimony of Corporal Dennis O'Brien of the Santa Fe County Sheriff's Department and Task Force Agent Ernie Romero; Defendant Victor Avila testified on his own behalf.

*Findings of Fact*

        Having heard the testimony and having considered the exhibits admitted during the hearing, the Court makes the following findings of fact. On July 17, 2001, at approximately 5:00 p.m., Corporal Dennis O'Brien of the Santa Fe County Sheriff's Department had driven to the Chimayo Spillway Road in Santa Fe County, New Mexico to look for a vehicle stolen from his father. Corporal O'Brien knew the Chimayo Spillway Road to be an area where stolen cars were sometimes abandoned and where people went to use drugs. As Corporal O'Brien turned onto the Chimayo Spillway Road, he saw a blue Chevrolet Beretta parked in the middle of the roadway blocking the road. The Chevrolet Beretta appeared to have been abandoned. Corporal O'Brien

parked his car in front of the Chevrolet Beretta and got out to inspect the it. Upon looking inside of the Chevrolet Beretta, he saw Defendant Victor Avila asleep in the driver's seat and Angela Vargas asleep in the passenger seat. Both seats were reclined and Corporal O'Brien had not been able to see the occupants until he walked up to the Chevrolet Beretta and looked inside. Corporal O'Brien noticed that the Chevrolet Beretta did not have a license plate but, instead, had a temporary registration tag.

Although Corporal O'Brien radioed the dispatcher and reported the information on the temporary registration tag in order to determine who the car belonged to, the dispatcher could not obtain the identity of the registered owner because the dispatcher's computer system could not track temporary registration tags. Sometime after the encounter Corporal O'Brien contacted the Motor Vehicle Division and determined that Isabel Degeer was the registered owner of the Chevrolet Beretta.

After looking into the interior of the Chevrolet Beretta for weapons, Corporal O'Brien tapped Defendant Victor Avila on the shoulder through the open window of the car. Both Defendant Victor Avila and passenger Angela Vargas awoke and pulled their seats upright. When the occupants pulled their seats to an upright position, Corporal O'Brien saw a soft, zippered gun case on the transmission hump behind the center console. At that point, Corporal O'Brien drew his pistol from its holster and held it down at his side. Corporal O'Brien then told Defendant Avila and Vargas to place their hands on the dashboard because of concerns about officer safety and asked in English whether there was a gun in the case. Passenger Vargas replied, "No." Corporal O'Brien then asked passenger Vargas to hand him the gun case which passenger Vargas did. Corporal O'Brien felt a hard lump inside the gun case.

2

Corporal O'Brien then asked in English to whom the case belonged and neither Defendant Avila nor passenger Vargas answered. Corporal O'Brien then repeated the question in Spanish and Defendant Avila responded in Spanish that the case belonged to someone who had been sitting in the backseat but who had left. Corporal O'Brien then asked in English if he could look inside the gun case to make sure there was no gun. Passenger Vargas granted permission in English. Corporal O'Brien opened the case and found inside a clear plastic baggy containing numerous colored balloons filled with what Corporal O'Brien believed to be narcotics, plus several larger balls of a substance he believed to be narcotics wrapped in aluminum foil, and a large wad of U.S. currency in a white sock. The substances found in the balloons and in the aluminum foil later tested positive for heroin.

Corporal O'Brien then went to his car, got his rifle, and called for backup. Approximately ten to fifteen minutes later, Corporal Ernest Borrego and Deputy Fred Jasler arrived at the scene in response to the call for backup. The officers removed Defendant Avila and passenger Vargas from the Chevrolet Beretta and patted them down, whereupon they found a second wad of U.S. currency in Defendant Avila's pants pocket. The officers looked around the area for the third person who Defendant Avila said had been in the backseat, but did not find anyone. Corporal O'Brien asked Defendant Avila who the drugs belonged to and Defendant Avila responded that they were his, and that passenger Vargas had nothing to do with the drugs.

Deputy Jasler placed passenger Vargas in his vehicle and explained her *Miranda* rights. Passenger Vargas stated that she understood her rights and then gave a written statement that the gun case belonged to a man named "Flores" who had hitched a ride with Defendant Avila and

3

passenger Vargas. According to passenger Vargas' written statement, Mr. Flores left the gun case in the car when Flores departed while Defendant Avila and passenger Vargas were sleeping.

Corporal O'Brien called a dispatcher and asked that a narcotics agent come to the scene and approximately an hour later, in response to that request, Task Force Agent Ernie Romero arrived. Agent Romero instructed Deputy Jasler to call for a tow truck because he was going to arrest Defendant Avila and passenger Vargas did not have a driver's license. Agent Romero decided to conduct a routine inventory search of the Chevrolet Beretta at the scene. He told Defendant Avila that the car had to be towed and asked Avila whether there were any more drugs in the car. Defendant Avila responded, "No, take the car apart if you want to." Agent Romero then asked Avila, specifically, whether he would consent to a search of the car. Defendant Avila responded, "Go ahead, I told you to take the car apart if you want to." However, Defendant Avila refused to sign a written consent to search form, stating, "I told you you could search it." Agent Romero once again told Defendant Avila that he was going to search in places where drugs could be hidden and Avila responded, "Go ahead."

Agent Romero then told passenger Vargas that Defendant Avila had given him consent to search the Chevrolet Beretta and asked passenger Vargas whether there was anything in it that was illegal or that could harm the officers. Passenger Vargas responded that there was a crack pipe in the car. Agent Romero asked passenger Vargas if that was everything, and she responded that there was an ounce of heroin in an amplifier in the trunk. Agent Romero then looked in the amplifier and found a golf-ball sized item covered with black tape, the contents of which later tested positive for heroin.

When Agent Romero told Defendant Avila that his car was going to be towed, Defendant Avila asked whether passenger Vargas was going to be arrested. Agent Romero said that he was uncertain what was going to happen to her. Defendant Avila then said that the drugs belonged solely to him and that the money was proceeds from drug sales. Agent Romero then said that if passenger Vargas had knowledge of the drugs and sales of the drugs, she might be charged, whereupon Defendant Avila responded, "I go to Mexico and get the heroin to sell. She has nothing to do with them."

Defendant Avila was arrested and placed in the Santa Fe County Detention Center. The passenger in the car, Ms. Vargas, was never charged. New Mexico charged Defendant Avila with drug offenses concerning the heroin found in the vehicle. While in the Santa Fe County Detention Center, Defendant Avila asked Ms. Vargas to contact Agent Romero and arrange for Agent Romero to meet with Defendant Avila. Ms. Vargas did so on more than one occasion.

On July 30, 2001, Agent Romero and two other officers went to the Santa Fe Detention Center to interview Defendant Avila. Defendant Avila told the officers that he did not have an attorney. At that time New Mexico had dropped the criminal charges against Defendant Avila, but the United States had filed a federal criminal complaint filed against Defendant Avila on July 26, 2001. Defendant Avila had not yet been arraigned in federal court.

Before the interview began, Agent Romero advised Defendant Avila of his Miranda rights. After informing Defendant Avila of his Miranda rights, Defendant Avila signed a written document waiving his right to an attorney and his right to avoid self-incrimination. Then Defendant Avila provided Agent Romero with a statement detailing his involvement with heroin

distribution in Espanola. Defendant Avila also told the police officers that he had asked Ms. Vargas to initiate a dialog with the officers on his behalf.

Defendant Avila seeks to suppress evidence in the form of (1) all controlled substances discovered on July 17, 2001, (2) all other items seized on July 17, 2001, and (3) all statements made by Defendant Avila to law enforcement officers on July 17, 2001 and July 30, 2001. Def.'s Mot. to Suppress at 1. The United States argues that Defendant Avila never demonstrated any privacy interest that was entitled to protection under the Fourth Amendment, Pl.'s Resp. at 5, and that, with the exception of one question on July 17, 2001, all of the declarations Defendant Avila made on July 17 and July 30, 2001, were made voluntarily.

*Legal Standard*

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Brown v. United States*, 411 U.S. 223, 230 (1973). Before an individual can assert Fourth Amendment rights, that individual must demonstrate a reasonable expectation of privacy in the place searched. *Katz v. United States*, 389 U.S. 347, 353 (1967). An individual's reasonable expectation of privacy has two components: whether the individual "has manifested a subjective expectation of privacy in the area searched and whether that expectation is one society would recognize as objectively reasonable." *U.S. v. Betancur*, 24 F.3d 73, 76 (10th Cir. 1994) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas v. Illinois*, 439 U.S. 128, 144 n.12 (1978).

*Conclusions of Law*

Defendant primarily challenges the "initial seizure of the gun bag that then led to all that subsequent discovery and statements . . . ." Hr'g Tr. at 68. Defendant argues that because in New Mexico the possession of firearms in a car is legal, Corporal O'Brien lacked a valid reason to seize and search the gun case. Defendant's argument for suppression falls short in many particulars.

As an initial matter, Corporal O'Brien had a valid reason to seize the gun case: his personal safety. Corporal O'Brien found Defendant Avila asleep in a car parked in the middle of a state road. Parking a car in the middle of the road is illegal, and that alone provided Corporal O'Brien sufficient, articulable, suspicion to investigate the situation. *United States v. King*, 990 F.2d 1552, 1557 (10th Cir. 1993) (holding that an investigative detention must be justified at its inception). Once Corporal O'Brien saw the gun case in the car, he was entitled remove the gun case and inquire about its contents for his personal safety. *Id.* at 1561 (holding that a police officer is entitled to separate a gun from detained individuals). Before Defendant Avila can assert that Corporal O'Brien violated the Fourth Amendment when he searched the gun case, Defendant Avila must demonstrate a reasonable expectation of privacy in the gun case. *United States v. Betancur*, 24 F.3d 73, 76 (10th Cir. 1994) ("A defendant who seeks to exclude evidence carries the burden of establishing that his own Fourth Amendment rights have been violated as a result of a search.")

Even if Defendant Avila retained a subjective expectation of privacy in the gun case, he failed to provide any evidence proving an objective expectation of privacy in the gun case. Defendant Avila's objective expectation of privacy in the gun case "is a question of intent which

may be inferred from words, acts, and other objective facts. *U.S. v. Hernandez*, 7 F.3d 944, 947 (10th Cir. 1993). When asked by Corporal O'Brien to whom the gun case belonged, Defendant Avila stated that the gun case belonged to a third person who had been riding in the back seat, but was no longer in the car. In making that statement, Defendant Avila relinquished any objective privacy interest he may have had in the gun case, and at that point the gun case became abandoned property. *United States v. Garzon*, 119 F.3d 1446, 1450, 1452 (10th Cir. 1997) (stating that denial of ownership amounts to abandonment). Without proof of an objective expectation of privacy that society would deem reasonable, the warrantless search of the gun case, which Corporal O'Brien believed belonged to somebody else, did not offend the Fourth Amendment. *Hernandez*, 7 F.3d at 947 ("A warrantless search and seizure of abandoned property is not unreasonable under the Fourth Amendment.").

Defendant Avila asserts that Corporal "O'Brien had no lawful authority to order [passenger Vargas] to give him the closed gun case," and that it was "the unlawful seizure of the closed gun case that led to the subsequent detention and discovery of the heroin." Def.'s Mot. to Suppress at 3. The argument is an attempt to circumvent the abandonment issue because the doctrine of abandonment applies only in the absence of unlawful police conduct preceding the abandonment. *United States v. Ward*, 961 F.2d 1526, 1535 (10th Cir. 1992) ("Abandonment will not be recognized when it is the result of illegal police conduct."), *overruled on other grounds by U.S. v. Donskikh*, 21 F.3d 1024, 1025 (10th Cir. 1994).

However, Corporal O'Brien did not offend the Fourth Amendment by asking passenger Vargas to hand him the gun case. Corporal O'Brien's concern for his personal safety justified removing the gun case from Defendant Avila's and Ms. Vargas' immediate reach. *King*, 990 F.2d

8

at 1561. Corporal O'Brien testified that when Defendant Avila adjusted the car seat after being awakened, the gun case became visible. When Corporal O'Brien saw the gun he was startled. Hr'g Tr. at 27. He thought that a gun probably was inside the case or somewhere else in the car. *Id*. Corporal O'Brien did not "want to get hurt," so he told Defendant Avila and passenger Vargas place their hands on the dash board. *Id*. Fearing a gun was in the gun case, Corporal O'Brien asked passenger Vargas to hand him the gun case so that he could insure his safety. Hr'g Tr. at 27-28. Given Corporal O'Brien's legitimate concern for his personal safety, the Court cannot say that Corporal O'Brien's request was unlawful. *Michigan v. Long*, 463 U.S. 1032, 1049 (1983) (permitting limited search of passenger compartment of lawfully detained automobile and seizure of any weapon found based on reasonable suspicion that driver is dangerous and may gain control of a weapon); *King*, 990 F.2d at 1561; *Arkansas v. Sanders*, 442 U.S. 753, 765 n.13 (1979) (noting that "some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance"), *overruled on other grounds by California v. Acevedo*, 500 U.S. 565, 579 (1991).

Defendant Avila attempts to cast Corporal O'Brien's actions as unlawful under the Fourth Amendment because it is legal to carry a gun inside a car in New Mexico. However, the legality of the gun is irrelevant in analyzing Corporal O'Brien's behavior. Separating Defendant Avila from the gun case was necessary for Corporal O'Brien's "safety, and a legally possessed weapon presents just as great a danger to [his] safety as an illegal one." *King*, 990 F.2d at 1561. Because Corporal O'Brien's behavior was at all time legitimate and lawful, there is nothing

preceding Defendant Avila's declaration that the gun case belonged to a third party which could undermine the Court's conclusion that Defendant Avila abandoned the gun case.

Notwithstanding the discovery of the heroin inside the gun case, Defendant Avila contends that the subsequent search of the car was illegal because he was detained unlawfully. The argument is without merit because Corporal O'Brien began the encounter by investigating an illegally parked car before he detained Defendant Avila in order to investigate the situation further. *Terry v. Ohio*, 392 U.S. 1, 20 (1968) (permitting the detention of individuals as long as the detention was "justified at its inception").

Nor can Defendant Avila demonstrate an expectation of privacy in the car upon which to assert rights under the Fourth Amendment. Defendant Avila admits that the car was not his. Yet, Defendant Avila asserts an expectation of privacy based on his testimony that he had permission from the car's owner, Fransico, to use the car. To counter that evidence, the United States produced evidence that the car did not belong to anyone named Fransico, but rather was registered to a woman named Isabel Degeer. Without proof that Fransico was the owner of the car, or that Fransico and Isabel Degeer were somehow linked vis-à-vis the car, Defendant Avila failed to carry his burden of demonstrating that he had lawful possession of the car. *Betancur*, 24 F.3d at 77 (holding that having permission to drive a car is insufficient to show a reasonable expectation of privacy without evidence that the permission came from the car's owner). Without proof that Defendant Avila had lawful possession of the car, Defendant Avila cannot demonstrate an expectation of privacy that the Court can find objectively reasonable. *Id*. Without a reasonable expectation of privacy, Defendant Avila does not have "the capacity to claim the protection of the Fourth Amendment." *Rakas*, 439 U.S. at 143. Therefore, the contraband and

other physical evidence secured by the police as a result of the July 17, 2001, investigatory stop can be admitted as evidence in Defendant Avila's trial.

At the hearing on November 27, 2001, the Court reserved ruling on the admissibility of Defendant Avila's statements made to the police in the Santa Fe County Detention Center on July 30, 2001. Although the Court gave the parties an opportunity to present additional evidence and brief that issue, neither party took advantage of that opportunity. Because the Court has found that Defendant Avila used Ms. Vargas as an intermediary to instigate the meeting and questioning, and Agent Romero fully informed Defendant Avila of his Miranda rights before the questioning began, the police did not violate Defendant Avila's right to counsel under the Sixth Amendment. *Toles v. Gibson*, 269 F.3d 1167, 1182 (10th Cir. 2001) (holding that if the "accused initiates further communication with the police" after the accused invokes his rights under the Sixth Amendment, the constitution is not violated).

Although Defendant Avila argued in his brief to the Court that his statements on July 30, 2001, were not voluntary, he offered little evidence at the hearing to support that claim. Defendant Avila's testimony that he waived his *Miranda* rights "Because [the police] told me that *possibly* I might be able to get out" does not undermine the Court's conclusion that his consent was voluntary. (Emphasis added.) Assuming that the police even said that to Defendant Avila, the Court finds that the statement is not sufficiently coercive or overbearing to overcome Defendant Avila's free will and render his statements involuntary. *U.S. v. Falcon,* 766 F.2d 1469, 1477 (10th Cir. 1985). The police certainly never told Defendant Avila that he *would* get out of jail, nor did they physically threaten or verbally abuse him in any manner.

However, the Court need not dwell on the coercive nature of the alleged comment that Defendant Avila "possibly" might get out of jail because Defendant Avila's assertion that the police made such an offer is not worthy of belief. It was Defendant Avila who initiated the conversation in hope of an opportunity to get out of jail. The proffered testimony of Agent Romero was that Ms. Vargas instigated the meeting between the police and Defendant Avila because Defendant Avila "believed he could get out of jail if he helped the police." Hr'g Tr. at 32. The Court directly asked Agent Romero if the proffer was correct, and Agent Romero responded, under oath, "Yes, Sir." Hr'g Tr. at 39. Notably, Defendant Avila declined to cross examine Agent Romero on that point. However, during Defendant Avila's cross examination, the United States specifically asked Defendant Avila if he remembered "telling the agents that you had asked Ms. Vargas to contact them because you wanted to talk to them?" Hr'g Tr. at 71. Defendant Avila responded, "I do not recall that point." *Id.* Defendant Avila's preconceived notion that by aiding the police he may get out of jail cannot be held against the police officers. Other than Defendant Avila's testimony, which the Court does not find credible, there is no evidence that the police offered the possibility of release as an incentive for Defendant Avila to make a statement.

Finally, Defendant Avila seeks to have the statements he made to police officers on July 17, 2001, suppressed. Defendant Avila forwarded no specific argument or authority stating the grounds for suppression of these statements. Nonetheless, from the tenor of Defendant Avila's questioning during the suppression hearing, it is evident that he bases suppression of those comments on the fact that they were the product of a custodial interrogation. Defendant Avila's only statement that could be considered the product of a custodial interrogation was his answer to

Corporal O'Brien's question, posed approximately a half an hour after the drugs were found, "Whose drugs are these?" Defendant Avila responded that the drugs were his.

At the hearing on the motion to suppress, the United States admitted that Defendant Avila's response was not a spontaneous utterance. Hr'g Tr. at 13. That admission, plus the fact that Defendant Avila had been held detained for over ten minutes by Corporal O'Brien, while Corporal O'Brien was armed with an AR-15 rifle, leads the Court to conclude that Defendant Avila's response to Corporal O'Brien's question was the product of a custodial interrogation. *United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994) (observing that Miranda warnings may be required "before a suspect is actually arrested," such as when the police find it necessary to employ force "that is beyond the ordinary"). Although that single response will be suppressed, Defendant Avila's other comments on July 17, 2001, were all volunteered, and therefore they may be used as evidence at trial.

IT IS THEREFORE ORDERED that Defendant Avila's motion to suppress (Doc. No. 18) the controlled substances and other physical evidence seized on July 17, 2001, and the statements Defendant Avila made to police on July 30, 2001 is DENIED; with regard to the statements made on July 17, 2001, Defendant Avila's motion to suppress his response to Corporal O'Brien's question, "Whose drugs are these?" is GRANTED, but DENIED as to all other statements Defendant Avila made that day.

_____
CHIEF UNITED STATES DISTRICT JUDGE